# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-1141

**STATE OF LOUISIANA**

**VERSUS**

**KADE STARBUCK HENRY**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 24462-13
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********

Court composed of Billy Howard Ezell, Shannon J. Gremillion, and D. Kent Savoie, Judges.

**CONVICTION AFFIRMED;**
**SENTENCE VACATED AND REMANDED FOR RESENTENCING**
**AND INSTRUCTION REGARDING POST-CONVICTION RELIEF.**

**Sherry Watters**
**Louisiana Appellate Project**
**P. O. Box 58769**
**New Orleans, LA 70158-8769**
**(504) 723-0284**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Kade Starbuck Henry**

**John Foster DeRosier**
**Fourteenth Judicial District Attorney**
**Elizabeth Brooks Hollins**
**Charles Robinson**
**Cynthia Killingsworth**
**Assistant District Attorneys**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**GREMILLION, Judge.**

On August 15, 2013, Defendant, Kade Starbuck Henry, entered a trailer, where his brother lived, without authorization. Defendant was charged with unauthorized entry of an inhabited dwelling, a violation of La.R.S. 14:62.3 on October 15, 2013. A jury found him guilty as charged on May 11, 2017. Defendant had been incarcerated since July 11, 2015, on other charges; the trial court sentenced him to time served, noting he had "paid [his] debt on this charge . . . ."

Defendant now seeks review of his conviction. For the following reasons, we affirm Defendant's conviction but remand for resentencing and instruction regarding post-conviction relief.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. We find two errors patent in the record.

*Indeterminate Sentence*

Defendant received an indeterminate sentence. For the offense of unauthorized entry of an inhabited dwelling, the trial court sentenced Defendant to time served. Prior to sentencing, the trial court inquired whether the current charge was the only one that Defendant was being detained on in the Calcasieu Correctional Center at that time; he was informed that it was not, and that Defendant had other pending charges. When asked by the trial court how long Defendant had been incarcerated, the deputy clerk responded that Defendant had been incarcerated since July 11, 2015.

Louisiana Code of Criminal Procedure Article 879 requires the imposition of a determinate sentence. In *State v. Sedlock*, 04-564, pp. 2-3 (La.App. 3 Cir. 9/29/04), 882 So.2d 1278, 1280, *writ denied*, 04-2710 (La. 2/25/05), 894 So.2d 1131, this court, addressing a similar issue, held:

For the offense of cruelty to juveniles, the trial court imposed the following sentence: "The Court is going to sentence him to two years in the parish jail. I'm going to suspend all but time served of that two years. I'm going to place him on supervised probation for the balance of that two-year period. . . ." Rather than specify the period of probation, the trial court placed the Defendant on probation for "the balance of" the two-year period. In other words, the trial court placed the Defendant on probation for whatever time remained after the "time served" portion was deducted from the two years. Since the "time served" portion of the sentence was not specified, we find the trial court imposed an unspecified and indeterminate period of probation. Louisiana Code of Criminal Procedure Article 893(A) provides in pertinent part: "The period of probation shall be specified and shall not be less than one year nor more than five years." Since the probation period imposed in the present case was not specified and is indeterminate, we find that the sentence imposed for cruelty to juveniles should be vacated and the case remanded for resentencing specifying the period of probation in accordance with La.Code Crim.P. art. 893.

For unauthorized entry into an inhabited dwelling, Defendant faced a fine of not more than one thousand dollars or imprisonment with or without hard labor for not more than six years or both. It appears from the trial court's inquiry regarding Defendant's detention at Calcasieu Correctional Center that the court intended for Defendant's sentence to be served without hard labor, but the term was not specified, especially since it was unclear whether Defendant had been incarcerated on the current offense since July 11, 2015, or whether that may have been for another of his pending charges. Accordingly, Defendant's sentence should be vacated, and the case remanded for imposition of a specified term in accordance with La.R.S. 14:62.3.

*Application for Post-Conviction Relief*

The trial court failed to clearly advise Defendant of the time limitations for filing an application for post-conviction relief. According to La.Code Crim.P. art. 930.8, the prescriptive period for filing post-conviction relief is two years, and it begins to run when a defendant's conviction and sentence become final under the provisions of La.Code Crim.P. arts. 914 or 922. Defendant was informed that he

2

had two years from the date of sentencing "and sentence becoming final" to file an application for post-conviction relief.

It is not clear whether the trial court advised Defendant that he had two years from the date of sentencing, two years from the date the sentence becomes final, or both, to file an application for post-conviction relief. Thus, we instruct the trial court to correctly inform Defendant of the provisions of La.Code Crim.P. art. 930.8 at resentencing.

**ASSIGNMENT OF ERROR NUMBER ONE**

Defendant argues the State failed to prove him guilty of unauthorized entry of an inhabited dwelling beyond a reasonable doubt. The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not

second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville,* 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378.

"Unauthorized entry of an inhabited dwelling is the intentional entry by a person without authorization into any inhabited dwelling or other structure belonging to another and used in whole or in part as a home or place of abode by a person." La.R.S. 14:62.3(A). "Unauthorized entry of an inhabited dwelling requires general intent. General criminal intent is present when the circumstances indicate that the offender 'in the ordinary course of human experience must have adverted to the prescribed criminal consequences as reasonably certain to result from his act.'" *State v. Riviere*, 08-105, p. 5 (La.App. 5 Cir. 5/27/08), 986 So.2d 768, 770-71, *writ denied,* 08-1383 (La. 2/13/09), 999 So.2d 1146 (citation omitted). "In general intent crimes, the criminal intent necessary to sustain a conviction is established by the very doing of the proscribed acts." *State v. Williams*, 03-3514, p. 13 (La. 12/13/04),

4

893 So.2d 7, 16 (citing *State v. Kennedy,* 00-1554 (La. 4/3/01), 803 So.2d 916, 923; *State v. Holmes,* 388 So.2d 722, 727 (La.1980))

"It is not necessary that a person be present in the dwelling at the time of the unauthorized entry to satisfy the inhabitation requirement; however, it must be proven that someone was actually 'living' in the dwelling at the time." *State v. Morrison*, 07-5, p. 5 (La.App. 5 Cir. 3/27/07), 957 So.2d 203, 205, *writ denied*, 07-742 (La. 11/2/07), 966 So.2d 601, *and writ denied*, 08-2090 (La. 1/30/09), 999 So.2d 752. "In the case of a private residence, a person must have the consent of the occupant or an occupant's agent to constitute a defense to unauthorized entry." *State v. Butler*, 06-645, p. 5 (La.App. 5 Cir. 12/27/06), 948 So.2d 296, 299.

The jury heard lengthy but significant background information about Defendant's relationship with his family at trial. Defendant's father, Errol James "Jimmy" Henry, owned three corporations, H & H Metal Contractors, H & H Industrial Contractors, and Metal Outlet, with his brothers. Some of Mr. Henry's children, nieces, and nephews have in the past worked or presently work in the businesses. Defendant began working in the companies when he was around fourteen years old, sweeping floors. He became a steel erector and was a good employee. However, he began showing up late for work, and he was ultimately fired for insubordination.

Mr. Henry said "the harassment started" after Defendant's termination. Defendant made phone calls and had his friends call posing as customers. He "would hack into [the companies' social media] accounts[,]" posing as an officer of the companies and appearing to fire employees. Mr. Henry believed Defendant had twenty pizzas delivered to the companies one day, and he posted on social media that the businesses needed Christmas help. Every morning, employees spent the first thirty minutes of the day taking down the Facebook posts Defendant had placed

5

overnight, seven days a week. Defendant posed as an officer of the companies at a car dealership and attempted to purchase two trucks for one of the businesses. He posed as a purchasing agent for the companies and tried to buy thousands of dollars of tools from one of the companies' suppliers. Defendant also sent a text to Mr. Henry threatening to shoot him with one of the guns Mr. Henry had given him.

In an effort to get help for Defendant, Mr. Henry and his wife took him to many mental health facilities. Defendant was diagnosed as having bipolar disorder, schizophrenia, paranoia, and attention deficit disorder. After Defendant threatened Mr. Henry, Defendant was taken to Moss Regional Hospital, where he stayed "about seven days for psychoanalysis." However, Defendant would not take the medication prescribed for him. Defendant also was at Acadiana Mental and Rehab facility in "a lock-down for seven days[.]"

Defendant then entered a ninety-day program with New Beginnings at a cost to his family of $10,000. He was in jail before he went to New Beginnings. After four days at the facility, he threatened to kill one of the administrators, and he was returned to jail. Mr. Henry later testified Defendant went to a facility in Pineville run by Camp Beauregard, where he was supposed to stay for two years and be retrained for another occupation. Someone from that facility picked up Defendant from jail; Defendant "stayed there four days and they brought him back."

Mr. Henry obtained a permanent restraining order on behalf of H & H Metal Contractors, Inc.; H & H Industrial Contractors, Inc.; and Metal Outlet, Inc. against Defendant on July 26, 2012. The injunction prohibited Defendant from:

A. Using the name, company logos, or telephone numbers of H & H Metal Contractors, Inc., H & H Industrial Contractors, Inc., or Metal Outlet, Inc., to identify himself;

B. Claiming or stating to third parties that he is an employee, officer, or owner of H & H Metal Contractors, Inc., H & H Industrial Contractors, Inc., or Metal Outlet, Inc.;

C. Posting on social media, including Facebook pages, and on internet web pages false statements, including statements that he is an owner or CEO or officer or employee of plaintiffs herein;

D. Physically coming to the premises at 2241 E. Napoleon Street, Sulphur, Louisiana, or any of the company jobsites on which the company is performing work;

E. Contacting owners or officers of any of the three companies or their employees;

F. Calling or texting company officers or employees, either during working hours or during sleeping hours;

G. Attempting to charge his personal expenses on company accounts; and

H. Contacting customers and making false and disparaging comments and remarks to customers of the three named companies.

The injunction showed Defendant resided at 2860 Dunne Street. Mr. Henry intended the temporary restraining order and the permanent injunction to protect the reputation of his businesses and to stop the harassment of his employees, family, and customers. He testified he had reason to believe Defendant would cause physical harm to his family, employees, and customers. The injunction did not prohibit Defendant from going to or being at 2860 Dunne Street. The permanent injunction asked for service of process on Defendant at that address, and he was personally served there on August 1, 2012.

Mr. and Mrs. Henry purchased the house trailer on Dunne Street in Sulphur "about 2006 right after Hurricane Rita." Defendant graduated from high school around that time, and Mr. and Mrs. Henry sold the trailer to him. Defendant had no payments for the first six months, and then he was to pay $300 per month. The last payment Defendant made was on August 27, 2011; the balance was $11,550 at that time.

For a while, Defendant lived in the trailer without making payments, and Mr. Henry gave him money for living expenses, "just to kinda [sic] help him survive."

Defendant then signed the property back over via a dation en paiement to Mr. and Mrs. Henry on March 28, 2012. They returned "[e]very penny" of the money Defendant had paid to them. Defendant had destroyed the inside of the trailer, and "many, many repairs" had to be made. Mr. Henry considered Defendant to be "unofficially evicted" after he "tore all the walls up in the trailer, tore the paneling off the walls."

After the dation en paiement, Mr. Henry testified that Defendant "was just jumping from pillar to post, staying with podnahs and buddies and – we didn't keep up with him." Mr. and Mrs. Henry never served any notice of eviction regarding the trailer on Defendant, took back his keys, or changed the locks. Mr. Henry testified they did not feel they needed to formally evict Defendant. He stated, "[O]nce he defaulted on the payments, he was done. He was out. The only reason he was still there was because of our generosity and he's our son. That's it." Mr. Henry was "very uncomfortable" testifying against Defendant, but he felt he needed to do so "for the safety of the rest of [his] family[.]"

Testimony about when Defendant moved out of the trailer, when his brother Briar moved into it, and whether they lived there together was not clear. Briar said he and Defendant were not on good terms after Defendant took Briar's truck in March 2013. He said Defendant lived in the trailer until around that time, and Briar moved there around the middle of March. Briar testified that Defendant was not welcome at the trailer once he moved into it, and Defendant had not stayed there since that time. However, when Defendant's counsel asked Briar where Defendant was when Briar moved into the trailer, Briar responded, "2860 Dunne Street." None of Defendant's property was in the trailer; Briar said he had put it in the garage in the back yard at Mr. Henry's direction so it could be given back to Defendant when he returned.

8

Mr. Henry testified that he never told Defendant he could move back to the trailer with Briar. He recalled a time when Briar called him and said Defendant had called to say "he was heading for the trailer[.]" Defendant had nothing inside the trailer at that point. Mr. Henry testified, "[A]ll [Defendant's] stuff was outside in one of the sheds," according to what Defendant said. However, Mr. Henry believed Defendant "gave everything away" and had nothing left.

On July 26, 2013, Defendant came to the trailer and asked to go inside. Briar told him he was not allowed inside and stopped him from entry. He told Defendant he would "have to call the cops" if he did not leave, and he showed the restraining order to Defendant. Defendant "crumpled it up," and Briar called police. Briar testified, "I also grabbed ahold of him and we wrestled in the grass, and I ended up eventually getting [the crumpled restraining order] back from him." When police arrived, they grabbed and cuffed Defendant, "and that was about it." Briar made it clear he did not want Defendant to come back to the trailer.

Deputy Pat Bordelon of the Calcasieu Parish Sheriff's Office answered the call on July 26, 2013. When he arrived, shortly before another deputy, he "saw two, white males, looked like they had been arguing, and so [he] walked up to them." One of the men said the other was "not supposed to be here" because of a restraining order. Deputy Bordelon recognized Defendant and "asked him to stand up, turn around, put his hands behind his back." After Defendant refused, and Deputy Bordelon asked him two more times, he "put [Defendant] on the ground, tried to get his – got one handcuff on him." When Defendant finally "gave up his [other] hand," Deputy Bordelon cuffed it.

The officers "had never seen a restraining order that was from a business." Deputy Bordelon said the copy presented to them "threw us for a loop because like I said, we've never seen one like a business against a person. So then we were like,

9

well, I mean, we're not at the business." They "made several phone calls to supervisors, kinda [sic] explaining the situation." Part of the officers' confusion arose because the restraining order listed 2860 Dunne Street, the address of their call, as Defendant's address. Deputy Bordelon knew Mr. Henry owned both the H & H business and the trailer. They realized "there's a couple of clauses in here where it prevents the defendant from going to anything associated with the business . . . ." They "elected to go ahead and arrest him for violation of the restraining order and booked him in the jail." Had Deputy Bordelon not seen the restraining order, he thought they "would have probably issued [Defendant] a misdemeanor summons for trespassing." He thought Defendant clearly was not welcome at the trailer

Twenty days later, on August 15, 2013, Defendant returned to the trailer while Briar was at work. Briar had not given him permission to be there. Briar believed he was covered by the restraining order protecting employees of H & H Metal. He called Mr. Henry and said he had heard Defendant was again "heading for the trailer." Mr. Henry called the Sheriff's Department and met them at the trailer with a copy of the restraining order he believed showed Defendant was not allowed at the trailer or around Mr. Henry's employees, which included Briar. He saw "where [Defendant] kicked the front door in[.]"

Officers arrested Defendant in the trailer.

According to Mr. Henry, at the time of the arrest, Defendant was not living at the trailer, he had a copy of the restraining order, he knew he had signed over ownership of the trailer, and he knew "[h]e had no business being at that trailer whatsoever." He was not allowed at the trailer even without the protective order.

Sergeant Alton Johnson and Corporal Fontenot of the Calcasieu Parish Sheriff's Office answered the call on August 15, 2013 and found the back door of the trailer ajar but not damaged. Sergeant Johnson could hear movement in the back

of the trailer, and he called for the person to come to the door.  Sergeant Johnson entered the trailer when the person "said he couldn't walk."  He found Defendant "sitting in an office chair, which was – how he was propelling himself around the house."  Defendant identified himself and said his ankle and legs hurt.

When Sergeant Johnson asked Defendant what he was doing inside the residence, Defendant "said he had no other place to go."  Defendant "stepped outside, unwillingly" when Sergeant Johnson said "he wasn't supposed to be there[.]"  Corporal Fontenot arrived, and the officers placed Defendant under arrest.

Mr. Henry arrived while Sergeant Johnson was inside with Defendant, and he also told Defendant "he wasn't supposed to be there" because of the restraining order.  Defendant, on the other hand, said he had no other place to go, and the trailer was his residence because the address was on his driver's license.  Sergeant Johnson said the paperwork Mr. Henry had "looked like a restraining order, list of documents saying who could be in there or who can't be in his residence."  However, he admitted the address of 2860 Dunne Street was not specifically mentioned in the paperwork.

In *Butler*, 948 So.2d 296, the victim had a restraining order against the defendant, the father of her young child.  The victim found the defendant standing in the hallway of her apartment, but she did not immediately ask him to leave.  However, she asked him to leave when they began to argue, and she threatened to call police.  The defendant had retrieved a knife at one point, but he dropped it on the kitchen floor and fled the apartment.  The victim had not allowed the defendant access to her apartment that night.  The fifth circuit upheld the defendant's conviction, finding the evidence was sufficient to find he intentionally entered the victim's home without authorization.

11

The defendant in *State v. Shaw*, 30,477 (La.App. 2 Cir. 2/25/98), 708 So.2d 509, was inside the victims' rented residence when they returned home one evening. He told them friends had invited him, and they were inside the house. However, no one else was there. The defendant left peacefully when told to leave. The deadbolt lock on the front door of the home was damaged and partially broken. Several of the victims' belongings had been moved, but nothing was missing from the home. The defendant contended he had entered the home by mistake and left when he learned the house belonged to someone else. The second circuit affirmed the defendant's conviction for unauthorized entry of an inhabited dwelling.

Trial testimony in the present case showed Defendant intentionally entered a dwelling inhabited by Briar and used as Briar's home. Briar and Mr. Henry, the owner of the trailer, both testified Defendant did not have authorization to be there. Defendant told officers he went to the trailer because he had nowhere else to go. This fact did not justify his entry into the trailer. Defendant knew of the restraining order prohibiting him from contacting H & H employees, he knew Briar was an employee, and he knew Briar lived at the trailer. Even though Defendant had not been formally evicted from the trailer, he had signed over ownership of it to Mr. and Mrs. Henry. Defendant and Briar were not on good terms after Defendant took Briar's truck. Defendant knew or should have known the trailer was no longer his home, and he could not enter it at will.

As noted in *Williams*, 893 So.2d at 13, "the criminal intent necessary to sustain a conviction is established by the very doing of the proscribed acts" in this case. Accordingly, the evidence was sufficient to convict Defendant as charged.

### ASSIGNMENT OF ERROR NUMBER TWO

Defendant contends the district court erred in conducting a trial on double and triple hearsay, along with irrelevant testimony about the defendant's mental health,

12

other alleged bad acts, and alleged dangerousness, such that he could not get a fair trial and was denied due process of law.  He admits none of the testimony of which he now complains was a subject of the State's pre-trial motion seeking to offer evidence of other crimes Defendant had allegedly committed.  Thus, Defendant was required to make a contemporaneous objection to testimony he considered hearsay or evidence of other crimes or bad acts.  La.Code Crim.P. art. 841(A).

Defendant's appellate brief cites sixteen instances of alleged erroneously admitted testimony of bad acts and other crimes.  Those points are:

1.    Kade stopped showing up at work and was insubordinate;

2.    Kade and his friends made harassing phone calls posing as customers or officers to H&H officers and employees;

3.    Kade ordered 20 pizzas delivered to the company without payment; "all knew who ordered them";

4.    Kade posted an ad saying that H&H was hiring extra Christmas help and a destitute woman drove 30 miles to apply;

5.    Kade tried to buy two trucks in the company name, according to the Chevrolet dealership;

6.    Kade ordered unneeded materials from suppliers for the company;

7.    Kade texted his father, "I will shoot you with one of the guns you gave me.";*

8.    While in jail, a judge had Kade committed for seven days to Moss Regional, but he refused treatment and was returned to jail;

9.    Kade left treatment at New Beginnings after only 4 days and his parents were not refunded the thousands of dollars they paid for treatment;

10.   Kade received all of the money back that he had paid for Dunne Street, yet he was homeless and still continued to freeload at the trailer;

11.   Jimmy Henry called police because he "heard" Kade was in the trailer or on the way;

12.   Jimmy Henry claimed to be in fear of Kade harming himself, his business, and his employees;*

13

13. Jimmy Henry claimed Kade "tore up the walls" of the trailer;

14. Jimmy Henry said Kade had no belongings left at the trailer because Kade gave it all away;

15. Sgt. Alton Johnson testified that other patrols "had trouble with the defendant";

16. Cpl. Patrick Bordelon said he recognized Kade and "knew he was dangerous".

Defendant alleges all of these points also constitute hearsay with the exception of those he marked with an asterisk (*). Defendant, however, objected to only three at trial. Defendant is prohibited from alleging errors at trial when he did not state a contemporaneous objection. La.Code Crim.P. art. 841(A). Thus, we consider only these three instances.

First, Defendant lodged an objection when the State referred to "a lot of friction" between him and Mr. Henry around the time of Defendant's termination from his employment. The trial court agreed the testimony was prejudicial but not "to the point to where . . . it's beyond what is reasonable that the State is expected to prove." Next, Defendant objected on grounds of "relevance and prejudicial effect" when the State asked Mr. Henry if Defendant had ever directed any harassment or threats to him personally. The trial court overruled the objection without comment. Defendant objected a third time on grounds of hearsay when the State questioned Mr. Henry about calling the Sheriff's office on August 15, 2013, and Mr. Henry responded that he had heard Defendant was either in the trailer "or headed for the trailer," based on a call from Briar. The State argued the testimony explained why Mr. Henry did something; it was not offered for truth of the matter. The trial court sustained the objection with a warning to "[j]ust be careful."

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.Code Evid. art.

401. Relevant evidence is admissible, but it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. arts. 402, 403. To determine relevancy, a trial court "must determine whether the evidence bears a rational connection to the facts at issue in the case." *State v. Jacobs*, 07-887, p. 62 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 580, *writ denied,* 11-1753 (La. 2/10/12), 80 So.3d 468, *cert. denied*, 568 U.S. 838, 133 S.Ct. 139 (2012).

"'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted." La.Code Evid. art. 801(C). Although it is true that Briar's statement that Kade was on the way to the trailer as testified to by Mr. Henry is hearsay, the truth sought to be asserted was that Defendant intentionally entered the trailer without authorization. The fact that Defendant may have been on his way to the trailer does not prove he entered it or influence whether he had authorization to be in it. Thus, Mr. Henry's statement that Briar heard Defendant was on his way to the trailer did not prove the truth of the matter, and it was not hearsay evidence.

Further, Defendant's entry and presence were confirmed by officers who arrived at the scene. Other evidence established the intentional entry was unauthorized. Briar also testified, without objection, that he had heard Defendant was on his way to the trailer. Defendant offered no evidence to the contrary.

Even if this statement was hearsay, Defendant has shown no prejudice resulting from its admission because other evidence corroborated the testimony to which Defendant objected. Thus, any error regarding the hearsay nature of the statement, if at all, was harmless. *See State v. R.K.*, 10-982 (La.App. 3 Cir. 5/11/11), 64 So.3d 426.

15

The evidence of friction between Defendant and Mr. Henry and evidence of harassment or threats directed to Mr. Henry personally was relevant because it helped explain the issue of whether Defendant knew he was not authorized to be at the trailer.  Although it may have been prejudicial to Defendant because it helped establish that issue to his detriment, that prejudice did not outweigh the probative value of the evidence, which was rationally connected to the facts at issue.  Accordingly, this assignment of error lacks merit.  The admission of evidence to which Defendant objected did not prevent him from receiving a fair trial or deprive him of due process.

## DECREE

Defendant's conviction is affirmed.  Defendant's sentence is vacated, and the case is remanded for imposition of a specified term of years in accordance with La.R.S. 14:62.3.  At resentencing, the trial court should correctly inform Defendant of the provisions of La.Code Crim.P. art. 930.8.

**CONVICTION AFFIRMED;
SENTENCE VACATED AND REMANDED FOR RESENTENCING AND INSTRUCTION REGARDING POST-CONVICTION RELIEF.**